FILED
2021 SEP 16 AM 11:17
CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| UTAH IRON, CML METALS CORP., AND GILBERT DEVELOPMENT CORP., <br><br> Appellants, <br><br> v. <br><br> WELLS FARGO RAIL and HELM-PACIFIC LEASING, <br><br> Appellees. | **MEMORANDUM OPINION AND ORDER ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH.** <br><br><br> Case No. 2:18-CV-00962-BSJ <br><br> District Judge Bruce S. Jenkins |

Before the Court is Appellants Utah Iron, LLC ("Black Iron")[1], CML Metals Corporation ("CML"), and Gilbert Development Corporation's ("GDC") appeal of the bankruptcy court's memorandum decisions and orders.[2] The Court heard oral argument on February 5, 2021, by videoconference.[3] Mr. David J. Jordan and Ms. Ellen E. Ostrow appeared on behalf of Appellants. Mr. Troy J. Aramburu appeared on behalf of Appellees Wells Fargo Rail[4] ("Wells Fargo") and Helm-Pacific Leasing ("Helm"). The Court reserved on the matter. Having considered the parties' briefs, the arguments of counsel, and the relevant law, the Court hereby AFFIRMS the bankruptcy court's memorandum opinions and orders. Specifically, the Court

---

[1] Utah Iron was formerly known as Black Iron. Black Iron filed for Chapter 11 relief on June 1, 2017, in the U.S. Bankruptcy court for the District of Utah, Case No. 17-24816. Mot. to Substitute Party, ECF No. 71. On August 28, 2020, Black Iron filed its plan. *Id.* The plan substituted Utah Iron for Black Iron in the Wells Fargo litigation. On November 25, 2020, this Court granted the Motion to Substitute Party. ECF No. 72. Accordingly, Black Iron was terminated, and Utah Iron was added as a party. In this memorandum opinion, the Court will refer to Utah Iron as Black Iron because Black Iron was the relevant name throughout the history of this case and in all the court filings.

[2] Appellants appeal two orders on summary judgment and one order after trial.

[3] Min. Entry, ECF No. 75.

[4] Formerly known as First Union Rail Corporation.

AFFIRMS each of the bankruptcy court's opinion and orders: the summary judgment memorandum opinion and order on storage fees and trespass,[5] the summary judgment memorandum opinion and order on conversion,[6] and the decision and order after trial.[7]

BACKGROUND

Factual Background

This case revolves around a struggling mining operation and leased railcars. When the lessee of the rail cars, CML, defaulted on its leases in late 2014, it entered into forbearance negotiations with the lessor, Wells Fargo.[8] After CML's attempts to market and sell its Assets – the Comstock Mountain Lion Mine ("Mine"), the concentrate plant ("Mill"), and the real property then-owned by CML ("Property") stalled, it entered into an Asset Purchase Agreement ("APA") with GDC, its mining contractor.[9] GDC then assigned all of its rights under the APA to Black Iron.[10] Shortly after the Assets were assigned to Black Iron, Black Iron informed Wells Fargo it needed to move its rail cars or pay storage fees.[11] The ensuing saga of events resulted in years of litigation in the bankruptcy court. For a full account of the facts, see the bankruptcy court's opinions.[12] This Court will give a brief summary.

---

[5] Ct. Op., App. 65–86.

[6] *Id.* at 90–114.

[7] *Id.* at 01–64.

[8] Appellant Black Iron's Br., ECF No. 49, 7.

[9] Ct. Op., App. 04. *See generally* Ct. Op., Section IV. Facts, App. 06–16.

[10] *Id.* at 15.

[11] *Id.* at 68–71.

[12] Memorandum Decision on Black Iron's Storage Fees and Trespass Claims (App. 65–86); Memorandum Decision on Wells Fargo's Conversion Claims (App. 90–111); Memorandum Decision After Trial (App. 01–61).

CML purchased the Mine in 2005.[13] From 2010 to 2014, CML leased 540 railcars and four locomotives ("the Equipment") from Wells Fargo for the purpose of hauling iron ore.[14] In December of 2013, CML engaged Sagent Advisors, LLC, to market the Mine to potential buyers.[15] In February of 2014, the price of iron ore began to drop precipitously.[16] By October of 2014, CML suspended its operations.[17] Also in October of 2014, CML fell behind on payments to GDC.[18]

In November of 2014, CML defaulted under the Leases by failing to make payments to Wells Fargo.[19] Wells Fargo declared a default.[20] In response to the default, CML represented it would pursue sub-leasing opportunities and stated that "multiple strategic suitors [were] completing their final diligence and notations of financial terms."[21] Wells Fargo began negotiating a forbearance agreement with CML in December of 2014 and did not immediately pursue its default remedies.[22]

By February of 2015, CML and Wells Fargo had exchanged multiple drafts of a forbearance agreement, but CML had not signed an agreement.[23] In March of 2015, a potential purchaser of the Mine, Evraz, withdrew a non-binding proposal it had furnished to CML in April

---

[13] Ct. Op., App. 06 (CML's predecessor in interest, the Palladon Iron Corporation, purchased the Mine.).

[14] CML had four leases and related guaranties with Wells Fargo ("the Leases"). Ct. Op., App. 09–10.

[15] Ct. Op., App. 10.

[16] Id.

[17] Id.

[18] Appellant Black Iron's Br., ECF No. 49, 4.

[19] Ct. Op., App. 10.

[20] Id.

[21] Id. at 10–11.

[22] Id. at 11.

[23] Id. at 11–12.

of 2014.[24] CML and GDC then began discussing the sale of the Mine to GDC.[25] Over the course of a few days, CML's chairman of the board, Michael Conboy ("Conboy") and the chief principal of GDC, Steve Gilbert ("Steve"), engaged in negotiations over the phone.[26] Steve recorded many of the phone conversations.[27]

Also in March of 2015, Wells Fargo demanded that CML execute the forbearance agreement.[28] CML then filed a complaint against Wells Fargo for breach of contract and breach of the implied covenant of good faith and fair dealing.[29] Wells Fargo counterclaimed against CML and demanded the return of the Equipment.[30]

Prior to the execution of the APA between CML and GDC, Conboy suggested Steve create a new entity so GDC could avoid incurring potential environmental liabilities at the Mine.[31] The parties inserted a provision into the APA that "CML will convey the assets to GDC or, at GDC's direction, GDC's nominee."[32] On April 2, 2015, CML and GDC signed the APA.[33] On April 14, 2015, Steve formed Black Iron, a Utah limited liability company.[34] On April 29, 2015, GDC and Black Iron entered into an Assignment of Agreement Rights under Asset Purchase Agreement ("the Assignment"), under which GDC assigned all of its rights under the

---

[24] *Id.* at 12.

[25] *Id.* at 14.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 12.

[29] *Id.*

[30] *Id.*

[31] Tr. Dep. Michael Conboy, Mar. 27, 2018, App. 5917–18.

[32] Ct. Op., App. 15.

[33] *Id.* at 4.

[34] *Id.* at 15.

APA to Black Iron.[35] The transaction closed on May 5, 2015.[36] Under the Assignment, GDC assigned all of its rights under the APA to Black Iron.[37] Like the bankruptcy court, this Court will refer to this entire sequence of events as the "Transfer."[38]

CML did not return the Equipment to Wells Fargo before the Transfer.[39] Rather, CML left the Equipment on the Property.[40] At the closing, the title company disbursed payments to various creditors, but, as had been previously agreed to by Steve and Conboy, no amounts were paid to Wells Fargo.[41] Wells Fargo did not learn about the Transfer until after it had closed.[42]

On or about May 8, 2015, Black Iron contacted Wells Fargo.[43] It asked that the Equipment be removed by June 1, 2015, and stated it would otherwise charge storage fees.[44] Wells Fargo stated it would remove the Equipment.[45] From May through August of 2015, Wells Fargo coordinated the removal with repair teams, inspectors, and other personnel.[46] Much of the Equipment required repairs before it could be moved.[47] Over the summer, Wells Fargo and Black Iron routinely communicated regarding the removal efforts.[48] Black Iron never gave Wells Fargo a removal deadline or otherwise indicated it was impatient with Wells Fargo's efforts to remove

---

[35] *Id.*

[36] *Id.* at 4.

[37] *Id.* at 15.

[38] *Id.*

[39] *Id.* at 16.

[40] *Id.*

[41] *Id.*

[42] Appellees' Br., ECF No. 58, 8.

[43] Appellant Black Iron's Br., ECF No. 49, 9.

[44] *Id.*

[45] *Id.*

[46] Ct. Op., App. 68–69.

[47] *Id.* at 69.

[48] *Id.* at 81–84.

the Equipment.[49] Within six weeks of the May 8, 2015 email, Wells Fargo had hired a repair

vendor to travel from Missouri to Utah that was set to start work the week of August 24, 2015.[50]

On August 19, 2015, Wells Fargo filed a complaint against Black Iron and GDC claiming

the Transfer was a fraudulent conveyance.[51] On August 20, 2015, Black Iron sent Wells Fargo an

email instructing it to "cease and desist" its plan to remove the Equipment.[52] The email stated,

"Please be advised due to legal issue [sic] pertaining to storage and security of the rail cars

sitting on the Black Iron, LLC property these car [sic] cannot be moved until these issues are

resolved."[53]

From September 2015 through August 2016, the parties attempted to re-engage in

removal efforts.[54] For example, on September 17, 2015, an attorney from Wells Fargo emailed

Black Iron seeking to confirm a phone conversation in which Black Iron gave Wells Fargo

permission to enter the Property and remove the Equipment.[55] The parties had outstanding

questions involving the ownership of different rail road tracks, some of which required repairs

before the Equipment could be moved.[56] By April of 2016, Black Iron demanded nearly $2.5

---

[49] *Id.*

[50] *Id.*

[51] Appellee Wells Fargo's Mot. Summ. J. on Black Iron's claims, App. 122.

[52] Ct. Op., App. 69.

[53] *Id.* at 72.

[54] *Id.* at 43–46.

[55] *Id.* at 44. The bankruptcy court found no evidence on the record to indicate Black Iron ever confirmed the grant of permission.

[56] *Id.* at 45–46.

million in storage fees from Wells Fargo before it could retrieve its Equipment.[57] By July 2016, the amount has increased to over $16 million.[58] And in August, it was $23 million.[59]

In June of 2017, Black Iron filed for Chapter 11 relief.[60] In April of 2018, Wells Fargo moved the bankruptcy court for permission to enter the Property and remove the Equipment.[61] The bankruptcy court authorized Wells Fargo to remove the Equipment and required it to post a bond of $10 million.[62] In July of 2018, Wells Fargo sold the Equipment in place (as-is, where-is) to a scrap company for $3,614,416.[63] The bond remains in place.[64]

The Bankruptcy Court's Decisions

The bankruptcy court ruled on two motions for summary judgment. The first summary judgment motion was brought by Wells Fargo and sought to have Black Iron's claims against it for storage fees and trespass dismissed.[65] After a hearing, the bankruptcy court granted Wells Fargo's motion and issued a memorandum decision and order on December 4, 2018 ("Storage Fees and Trespass Order").[66] The second summary judgment motion was also brought by Wells Fargo and sought the bankruptcy court's ruling on its conversion claim against Black Iron.[67] After a hearing, the court granted Wells Fargo's motion and issued a memorandum decision and

---

[57] *Id.* at 102.

[58] *Id.* at 102.

[59] *Id.* at 102.

[60] Appellant Black Iron's Br., ECF No. 49, 13.

[61] Appellees' Br., ECF No. 58 at 10.

[62] *Id.*

[63] Appellant Black Iron's Br., ECF No. 49, 12.

[64] Appellees' Br., ECF No. 58, 10.

[65] *See* Ct. Op., App. 65–86.

[66] *Id.* at 65–89.

[67] *Id.* at 91.

order on December 14, 2018 ("Conversion Order").[68] Additionally, after a trial, the bankruptcy

court issued a memorandum decision and order finding Black Iron and GDC liable for fraudulent

transfer ("Decision After Trial") under Utah's Uniform Fraudulent Transfer Act ("UFTA").[69]

The court awarded Wells Fargo damages against Black Iron and GDC under the UFTA in the

amount of $2,618,680.44.[70] The court also awarded Wells Fargo damages against Black Iron for

conversion in the amount of $7,885,584.[71]

   Black Iron and GDC now appeal the bankruptcy court's decisions.[72]

DISCUSSION

## I. Standard of Review

   A district court reviews "the bankruptcy court's legal determinations *de novo* and its

factual findings under the clearly erroneous standard." *In re Miniscribe Corp.*, 309 F.3d 1234,

1240 (10th Cir. 2002) (citation omitted). "A finding of fact is clearly erroneous if it is without

factual support in the record or if, after reviewing all of the evidence, we are left with the definite

and firm conviction that a mistake has been made." *Id.* A mixed question of law and fact where

the legal analysis predominates is reviewed *de novo*. *In re U.S. Med., Inc.*, 531 F.3d 1272, 1275

(10th Cir. 2008) (citation omitted).

---

[68] *Id.* at 90–114.

[69] *Id.* at 01–64. In 2017, the UFTA was renamed the Uniform Voidable Transactions Act. Because the UFTA was in effect during the year of the Transfer, 2015, the bankruptcy court applied the UFTA.

[70] *Id.* at 60.

[71] *Id.* at 60.

[72] Appellants' Brs., ECF No. 48 and ECF No. 49.

## II. Storage Fees and Trespass Order

The bankruptcy court granted Wells Fargo's motion for summary judgment on Black Iron's claims for storage fees and trespass.[73] Black Iron raised four theories under its storage fees claim: express contract, breach of an implied-in-fact contract, breach of an implied-in-law contract, and a warehouse lien.[74] Black Iron now appeals the bankruptcy court's ruling on three of its theories for storage fees: implied-in-fact contract, implied-in-law contract, and warehouse lien.[75] Black Iron also appeals the bankruptcy court's ruling denying its trespass claim.[76]

## A. Contract Implied-in-Fact

Black Iron argues the bankruptcy court conflated the implied-in-law and implied-in-fact contract claims.[77] Specifically, Black Iron argues the bankruptcy court treated both claims under the elements of an implied-in-law contract and did not analyze or discuss the elements of an implied-in-fact claim.[78] Additionally, Black Iron argues there are disputes of fact that would have precluded summary judgment had the bankruptcy court properly analyzed the claims.[79] On *de novo* review, this Court finds there was no implied-in-fact contract between Black Iron and Wells Fargo.

Contracts implied-in-fact have three elements: "(1) the defendant requested the plaintiff to perform work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected

---

[73] Ct. Op., App. 65–89.

[74] *Id.* at 71–79.

[75] Appellant Black Iron's Br., ECF No. 49, 15–25.

[76] *Id.* at 25–30.

[77] *Id.* at 15–19.

[78] *Id.* at 15–17.

[79] *Id.* at 17–19.

compensation." *Davies v. Olson*, 746 P.2d 264, 269 (Utah Ct. App. 1987). These contracts are "established by conduct" and "require a meeting of the minds." *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1012 (Utah 2015). A meeting of the minds requires an offer and acceptance. *Lebrecht v. Deep Blue Pools & Spas Inc.*, 374 P.3d 1064, 1069 (Utah Ct. App. 2016) (citation omitted). "An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Id.*

The bankruptcy court analyzed the implied-in-fact claim under a heading titled "Breach of Implied Contract."[80] After stating the elements for an implied-in-law claim, the bankruptcy court stated "contracts implied in fact are established by conduct."[81] Its analysis focused on whether there was a meeting of the minds.[82] A determination of whether there was a meeting of the minds is a factual determination reviewed for clear error. *See Co-Vest Corp. v. Corbett , Gurr, d/b/a Utah Ranchlands*, 735 P.2d 1308, 1309 (Utah 1987).

The bankruptcy court found there was no meeting of the minds between Black Iron and Wells Fargo.[83] It stated Black Iron failed to present evidence that demonstrated a meeting of the minds, and Wells Fargo demonstrated through statements and conduct it did not assent to a storage agreement with Black Iron.[84] Among the evidence the bankruptcy court considered was:

> Wells Fargo Rail stated that it did not want Black Iron to store the Equipment. Wells Fargo Rail took steps, hired contractors and otherwise made arrangements to retrieve the Equipment. By both statements and conduct, Wells Fargo Rail has demonstrated that it did not want to store its Equipment on Black Iron's Property. Wells Fargo Rail has submitted evidence that Black Iron refused it access to the

---

[80] Ct. Op., App. 75.

[81] *Id.*

[82] *Id.* at 75–76.

[83] *Id.*

[84] *Id.*

Property while Wells Fargo Rail was working with contractors to retrieve the Equipment.[85]

Additionally, the court analyzed whether there was a meeting of the minds under the express contract claim.[86] It found:

> Steve Gilbert informed a representative of Wells Fargo Rail that the railcars and locomotives had to be removed or Black Iron would impose storage fees. Wells Fargo Rail's representatives stated that the Equipment would be removed, and that it would not pay storage fees . . . The evidence submitted to the Court in the form of emails, depositions and affidavits show that Wells Fargo Rail did not want Black Iron to store the Equipment, but was taking steps to remove the Equipment from Black Iron's property. While an ultimatum is not an offer in any event, to the extent that Black Iron stated that Wells Fargo Rail should pay storage costs, Wells Fargo Rail rejected that proposition.[87]

First, this Court notes that the bankruptcy court indeed partially cited the wrong legal standard for a contract implied-in-fact, and instead cited the elements for a contract implied-in-law.[88] However, the bankruptcy court did not *apply* these elements when it analyzed the claim.[89] Rather, it focused on a key factor under an implied-in-fact analysis of whether there was a meeting of the minds.[90] Because the bankruptcy court did not *apply* the wrong legal standard, there is no reversible error. *See In re Stewart*, 970 F.3d 1255, 1263 (10th Cir. 2020) ("A [bankruptcy] court abuses its discretion when it (1) fails to exercise meaningful discretion, such as acting arbitrarily or not at all, (2) commits an error of law, such as applying an incorrect legal standard or misapplying the correct legal standard, or (3) relies on clearly erroneous factual findings.") (quoting *Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1256 (10th Cir. 2015)).

---

[85] *Id.* at 76.

[86] *Id.* at 72. Black Iron did not appeal the express contract claim.

[87] *Id.*

[88] *Id.* at 75–76.

[89] *See Id.*

[90] *See Id.*

A contract implied-in-law does not require a meeting of the minds.[91] If the bankruptcy court applied the elements of the contract implied-in-law, it would not have analyzed this element.

Additionally, on *de novo* review, this Court finds the contract implied-in-fact claim fails. Regarding the first element, Black Iron argues the Court could find Wells Fargo impliedly asked Black Iron to store the rail cars on Black Iron's property.[92] It points to its evidence that Steve "told Wells Fargo on May 8, 2015 that a failure to remove the Equipment from Black Iron's Property by June 1, 2015 would result in storage fees."[93] Black Iron argues that although Wells Fargo wanted to remove the Equipment but needed more time, "a reasonable factfinder could conclude that Wells Fargo's leaving the Equipment on Black Iron's property after June 1st, coupled with Steve's May 8th statement that storage fees would accrue, constitutes an implied request to provide storage services."[94] As to the second element, Black Iron argues it expected Wells Fargo to compensate it for storage services.[95] Finally, for the third element, Black Iron argues Wells Fargo knew it expected payment for the service of storing the cars because "evidence existed that Wells Fargo was well aware of that expectation."[96]

This argument fails for the reasons outlined by the bankruptcy court – there was no meeting of the minds between Black Iron and Wells Fargo. Wells Fargo rejected Black Iron's offer of storage services by making arrangements to remove the cars. Steve stated that Wells Fargo did not agree to pay storage fees, but rather elected to move the cars.[97] In email

---

[91] *See infra*, Part II.B.

[92] Appellant Black Iron's Br., ECF No. 49, 17–18.

[93] *Id.* at 18.

[94] *Id.*

[95] *Id.* at 18–19.

[96] *Id.* at 19.

[97] Tr. Dep. Steve Gilbert, Mar. 30, 2018, App. 212: (Mr. Aramburu: "I haven't heard anything yet about what you think the storage agreement was." Mr. Gilbert: "I told them that if they didn't work – if we had to go to storage it

12

communications between Wells Fargo and Black Iron representatives, Wells Fargo affirmed it did not intend to pay storage fees to Black Iron.[98] The undisputed evidence here shows that Wells Fargo never wanted Black Iron to store its Equipment or to pay storage fees. While Black Iron is correct that there does not need to be a meeting of the minds on every term, especially price term, there is no demonstrable meeting of the minds here on any term regarding storage fees. *See Davies*, 746 P.2d at 269 ("Technically, recovery in contract implied in fact is the amount the parties intended as the contract price. If that amount is unexpressed, courts will infer that the parties intended the amount to be the reasonable market value of the plaintiff's services.") (citation omitted). Black Iron gave Wells Fargo an ultimatum: get your cars or pay us storage fees.[99] Wells Fargo rejected the ultimatum and started the process to get their cars, manifesting an intent not to pay any storage fees. Accordingly, Black Iron was not entitled to storage fees under a contract implied-in-fact theory.

---

was going to be $100 a day. Mr. Aramburu: "And what did he say?" Mr. Gilbert: "He said he wasn't going to pay storage, he was going to move the cars.").

[98] Ex. Email from Bobby Bowers to Cyndi Gilbert, Sept. 2, 2015, App. 817. (Bobby Bowers writing to Cyndi Gilbert: "Recall that it was Black Iron/GDC that asked that the equipment be removed if [Wells Fargo] wasn't willing to pay to store them in place. You know that [Wells Fargo] had been taking the steps necessary to retrieve its equipment. That was taking time given the condition that CML left the cars and locomotives in. Black Iron/GDC had to know [Wells Fargo's] equipment was on-site when they closed the asset purchase with CML.").

[99] Tr. Dep. Steve Gilbert, Mar. 30, 2018, App. 212. (Mr. Aramburu: "Well, what you told me was you told Bobby to come get the railcars." Mr. Gilbert: "That Black Iron purchased the assets of CML, including the railroad tracks, and that we needed to get the cars removed ASAP and that my biggest concern was safety. And he agreed and he says – said, 'I need to get them out of here, can you get them out by June?' And he said, 'I'll go to work on it.' And about June 1st or the first week of June or whatever, they were out working on them getting them moved. I mean, they had a crew out there anyway. Mr. Aramburu: "All right. So is it Black Iron's position that there was a – an oral agreement?" Mr. Gilbert: "There was an oral agreement with Bobby Bowers that he would come get the railcars out of there in the beginning of June. Which they showed good faith, showed up and was out there doing their thing and everybody was working on getting them moved."); *See also Id.* at 213: (Mr. Aramburu: "I'm trying to figure out on what point you believe you had a meeting of the minds . . ." Mr. Gilbert: "Let me put it in cowboy terms. I point a gun at you and tell you to raise your hand or I'm going to blow your head off and you don't raise them up, I'm going to blow your head off. If you raise them up, I don't have to pull the trigger. So that's where we're at . . .").

## B. Contract Implied-in-Law

Black Iron argues the bankruptcy court did not properly apply the elements of a contract implied-in-law to its claim.[100] The elements of a contract implied-in-law are: 1) "a benefit conferred on one person by another;" 2) "the conferee must appreciate or have knowledge of the benefit;" and 3) "there must be the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000).

The bankruptcy court denied Black Iron's implied-in-law contract claim because it found Wells Fargo did not receive a benefit from Black Iron.[101] The bankruptcy court stated, "the uncontroverted evidence submitted demonstrates that Wells Fargo Rail wanted to extract its Equipment from the Property, not have it stored, and particularly not at the storage rates stated by Black Iron."[102] It further found that Wells Fargo "was prevented from retrieving its Equipment."[103] Because Wells Fargo did not receive a benefit from Black Iron, the contract implied-in-law claim failed.[104]

First, Black Iron argues the bankruptcy court erred by finding Black Iron did not confer a benefit on Wells Fargo by providing storage services.[105] It states Wells Fargo's Equipment was on its Property, and that "[i]f Wells Fargo could not timely remove the Equipment because it first needed to repair the cars, that was Wells Fargo's problem, not Black Iron's."[106] Black Iron then

---

[100] Appellant Black Iron's Br., ECF No. 49, 19.

[101] Ct. Op., App. 76.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] Appellant Black Iron's Br., ECF No. 49, 20.

[106] *Id.*

states that without its consent to leave the Equipment on its property, "Wells Fargo was simply trespassing."[107]

Black Iron's arguments here neglect the context surrounding why the cars were on its Property in the first place. It implies Wells Fargo simply dropped the Equipment off on its Property for storage. But this ignores the fact that the Equipment was leased to Black Iron's predecessor, CML, from 2010 to 2014.[108] Under CML's lease, CML had a duty to return the Equipment to Wells Fargo.[109] With the asset sale, CML walked away from its leases after months of forbearance negotiations with Wells Fargo.[110] Black Iron, for its part, specifically did not assume the leases in the APA.[111] Wells Fargo learned for the first time about CML's asset sale when Black Iron emailed Wells Fargo on May 8, 2015, demanding Wells Fargo remove the cars by June 1, 2015, or pay storage fees.[112] Wells Fargo then began making the complicated arrangements to remove the cars from the Property.[113] This complex process involved removing 540 railcars and four locomotives that were in various states of disrepair, were spread over various areas of the Property, and needed to be moved over railroads that in some cases also needed repair and had various owners.[114] As discussed under the trespass claim below, Wells Fargo acted reasonably in its efforts to remove the Equipment. Wells Fargo rejected Black Iron's

---

[107] *Id.*

[108] Ct. Op., App. 67–68.

[109] *See, e.g.*, App. 4419; 4432; 4444; 4451; 4458.

[110] Ct. Op., App. 67–69.

[111] *Id.* at 109.

[112] *Id.* at 68–69.

[113] *Id.* at 80–94.

[114] *Id.* at 80–84.

offer for storage and worked diligently to remove the cars. This Court agrees with the bankruptcy court that an involuntary situation cannot confer a benefit.

Second, Black Iron argues the bankruptcy court erred in determining Wells Fargo was prevented from retrieving its equipment.[115] It argues Wells Fargo was only prevented from retrieving its Equipment for a brief period, from August 20, 2015, through September 17, 2015.[116] Black Iron states Wells Fargo had plenty of opportunities to retrieve its cars after September 17, 2015.[117]

As discussed above, on August 20, 2015, Black Iron sent Wells Fargo a cease-and-desist email and stated the cars could not be moved until legal issues were resolved.[118] On summary judgment, the bankruptcy court determined this was the date of conversion.[119] Black Iron argued at trial that Wells Fargo failed to mitigate its damages because Wells Fargo had permission to retrieve the Equipment from September 17, 2015 through August 22, 2016.[120] But the bankruptcy court found the evidence presented by Black Iron regarding that alleged mitigation period inconclusive.[121] The bankruptcy court found that while there was an email from Wells Fargo's attorney to Steve and Cyndi Gilbert seeking to confirm a phone conversation regarding access to the Equipment, there was no evidence presented that Steve or Cyndi ever confirmed the permission to enter the property.[122]

---

[115] Appellant Black Iron's Br., ECF No. 49, 20.

[116] *Id.*

[117] *Id.*

[118] Ct. Op., App. 94.

[119] *Id.* at 106–07.

[120] *Id.* at 43–44.

[121] *Id.* at 44.

[122] *Id.* Upon review, there is an email from Melissa Meier of Union Pacific Railroad on Sept. 17, 2015. App. 873–74. The email is to Black Iron and Union Pacific email addresses, and is a follow up to a meeting from the previous day. The email contains action items regarding identifying which companies own certain tracks and lines and which

The bankruptcy court next found that Black Iron granted permission to enter the Property on March 15, 2016.[123] It found that Black Iron demanded storage fees on April 4, 2016, and that Wells Fargo hired a contractor to repair and move the Equipment, and "while there are email communications discussing the work necessary to move the Railroad Equipment, no railcars were ever actually removed . . . because the repair vendor hired by [Wells Fargo] stated that repairs were necessary before the Railroad Equipment could be moved."[124] In July of 2016, "a repair crew travelled from Missouri to Utah with the vehicles and equipment to repair and extract the Railroad Equipment."[125] The bankruptcy court found the mitigation period ended on August 22, 2016, when Black Iron sent a letter demanding payment of over $23 million before Wells Fargo would be allowed to remove the Equipment.[126]

At trial, the bankruptcy court ultimately found that Wells Fargo acted diligently during the mitigation period.[127] These factual findings are supported by evidence in the record and are not clearly erroneous. In conclusion, Black Iron did not confer a benefit on Wells Fargo. Additionally, it prevented Wells Fargo from retrieving its Equipment on August 20, 2015. Thus, there was no contract implied-in-law for storage fees.

---

company owns the land where the [Wells Fargo] cars were sitting. Toni Comforth of Black Iron sent an email to Melissa Meier of Union Pacific on October 14, 2015, stating, "Steve wants a time frame on when the cars will be moved?" App. 873. Melissa responded on October 19, 2015, and wrote, "The last update that I received internally is that we need confirmation from Black Iron that your private tracks at the mine site can be safely operated on by UP. Have you had an inspection and/or is this something that you can provide us at this time?" There is no record of a response from Toni Comforth to Melissa.

[123] *Id.*

[124] *Id.* at 45.

[125] *Id.*

[126] *Id.*

[127] *Id.* at 46.

C. Warehouse Lien

Black Iron argues the bankruptcy court erred by finding it did not have a warehouse lien

against Wells Fargo for storage fees.[128] Under Utah law:

> A warehouse has a lien against the bailor on the goods covered by a warehouse
> receipt or storage agreement or on the proceeds thereof in its possession for
> charges for storage or transportation, including demurrage and terminal charges,
> insurance, labor, or other charges, present or future, in relation to the goods, and
> for expenses necessary for preservation of the goods or reasonably incurred in
> their sale pursuant to law. Utah Code § 70A-7a-209.

The bankruptcy court found Black Iron did not satisfy the requirements of the warehouse

lien statute.[129] First, the bankruptcy court found Black Iron was not a warehouse because it did

not provide sufficient evidence that it had "accepted responsibility for storage and safekeeping of

the equipment." Second, the bankruptcy court found there was no storage agreement or storage

receipt.

On appeal, Black Iron argues the bankruptcy court erred by finding it did not accept the

responsibility for the safekeeping of the Property and by finding there was not a storage

agreement or storage receipt.[130] First, Black Iron argues the bankruptcy court did not apply the

liberal standard under *Enerco*[131] for determining whether an entity is a warehouseman, but rather

applied *Mesa Development Inc. v. Storage*.[132] Black Iron also faults the bankruptcy court for

disregarding factual evidence that Black Iron provided security services for the Equipment, and

---

[128] Appellant Black Iron's Br., ECF No. 49, 21–25.

[129] Ct. Op., App. 76–79.

[130] Appellant Black Iron's Br., ECF No. 49, 21–25.

[131] *Enerco, Inc. v. SOS Staffing Servs., Inc.*, 52 P.3d 1272, 1275 (Utah 2002).

[132] Appellant Black Iron's Br., ECF No. 49, 24. *MESA Development Inc. v. Storage*, No. 080904173, 2011 WL 8184136 (D. Utah Apr. 08, 2011).

argues a fact finder could find Black Iron accepted responsibility for the safekeeping of the Equipment.[133]

This Court finds the bankruptcy court properly applied the precedent under *Enerco*.[134] Black Iron avoids key language from the *Enerco* case: "the question of whether or not someone is a warehouseman depends upon whether he has *accepted* 'the responsibility of safekeeping the property of others *entrusted to him*.'" *Enerco, Inc.*, 52 P.3d at 1275 (quoting *Barlow Upholstery & Furniture Co. v. Emmel*, 533 P.2d 900, 901 (Utah 1975) (emphasis added). The *Enerco* case and the warehouse lien statute thus presuppose a party that wishes its chattel to be kept. However, in this case, Wells Fargo did not wish its chattel to be kept. It made plans to remove its Property and did not consent to pay storage fees. For Black Iron's part, it did not accept responsibility for the storage of the cars, but rather immediately requested the cars be moved once it had purchased the land. This Court agrees with the bankruptcy court that Wells Fargo did not entrust the Equipment to Black Iron. Further, Wells Fargo did not make an offer to Black Iron, either explicitly or implicitly, for storage services, such that Black Iron could accept the responsibility of safekeeping the Equipment.

At oral argument, Black Iron argued the responsibility "was thrust upon Black Iron by Wells Fargo's failure to remove its Property."[135] But this argument discounts the facts on the record, as discussed above. CML defaulted on its leases with Wells Fargo. If any party could be found to be thrusting the Equipment upon Black Iron, it was CML by selling the Property to Black Iron with the Equipment left on it.

---

[133] Appellant Black Iron's Br., ECF No. 49, 22–24.

[134] While the bankruptcy court cited to *Mesa Development*, it was to emphasize the fact that a warehouse lien cannot exist in the absence of a storage agreement, rather than to focus on the status of the warehouseman.

[135] Hr'g Tr., Feb. 5, 2021, at 26.

The warehouse lien statute also requires there to be a storage agreement between the parties or a storage receipt.[136] The bankruptcy court found neither.[137] Black Iron argues this was an error.[138] First, Black Iron reiterates its arguments made above regarding an implied-in-fact and implied-in-law contract.[139] This Court, having found Black Iron's arguments on those claims without merit, will not revisit them here. Second, Black Iron argues for the first time on appeal that its storage fee invoices were a "warehouse receipt" under the statute.[140] Accordingly, this argument was waived and is not properly before this Court on appeal.[141] Nevertheless, the argument is unavailing. Black Iron points to evidence in the record of invoices it first sent in the spring of 2016.[142] These invoices were sent nearly a year after the initial ultimatum was posed to Wells Fargo in early May of 2015, and nearly eight months after Black Iron sent the cease-and-desist letter to Wells Fargo on the eve of the repair team's departure from Missouri. Even if these invoices constituted receipts under the statute, Black Iron still cannot satisfy the requirement of a warehouseman as discussed above.

In conclusion, Black Iron was not entitled to a warehouse lien against Wells Fargo because it was not a warehouse under the statute, it did not have a storage agreement with Wells Fargo, and it did not send storage invoices to Wells Fargo until the spring of 2016.

---

[136] Utah Code § 70A-7a-209.

[137] Ct. Op., App. 78–79.

[138] Appellant Black Iron's Br., ECF No. 49, 21–25.

[139] *Id.* at 22.

[140] Black Iron's Mot. Summ. J, App. 928. Black Iron argued it had a valid storage agreement with Wells Fargo, but did not make the specific argument that the invoices were storage receipts. *See* App. 931.

[141] Appellate courts are not second-shot forums "where secondary, back-up theories may be mounted for the first time." *Tele-Communications, Inc. v. C.I.R.,* 104 F.3d 1229, 1233 (10th Cir. 1997) (citation omitted). Issues "not passed upon below" are waived. *Id.* (citation omitted). This includes situations where "a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial." *Id.* Appellate courts also do not consider "arguments raised in the [trial court] in a perfunctory and underdeveloped manner." *In re Rumsey Land Co., LLC,* 944 F.3d 1259, 1271 (10th Cir. 2019) (citation omitted).

[142] Ex. Decl. of Douglas P. Farr, App. 552–68; 685–86.

D. Trespass

Black Iron argues the bankruptcy court erred in finding Wells Fargo not liable for trespass.[143] "A person is liable for trespass when, without permission, he 'intentionally enters land in the possession of [another], or causes a thing or a third person to do so.'" *Purkey v. Roberts*, 285 P.3d 1242, 1247 (Utah Ct. App. 2012) (citations omitted). "The phrase 'enters land' includes the presence upon the land of a thing which the actor has caused to be or to remain there." *Id.* Trespass also occurs if a possessor of land withdraws consent for chattel to be on the land and the chattel remains. Restatement (Second) of Torts § 177 (1965).

> If [a] possessor consents to the presence on the land of a thing which is to be removed at some time thereafter, and if such consent is terminated or suspended, one entitled to the immediate possession of the thing is privileged, as against such possessor and [their] transferee, to be on the land at a reasonable time for the purpose of removing the thing in a reasonable manner and with reasonable promptness, unless he knows or has reason to know the time of such termination or suspension a reasonable period in advance. *Id.*

Black Iron argues the bankruptcy court misapplied the law regarding whether Wells Fargo acted with reasonable promptness and ignored disputed facts regarding the reasonableness of Wells Fargo's extraction efforts.[144] The bankruptcy court wrongly focused on Black Iron's motivations for withdrawing permission to enter the land, Black Iron argues, rather than on the reasonableness of the time period and Wells Fargo's extraction efforts.[145] Black Iron argues a reasonable fact finder could find Wells Fargo's failure to remove the Equipment from the date of the notice on May 8, 2015 to the date of the cease-and-desist letter on August 20, 2015 was not

---

[143]Appellant Black Iron's Br., ECF No. 49, 25.

[144] *Id.* at 25–30.

[145] *Id.*

reasonably prompt.[146] Additionally, Black Iron states the bankruptcy court erred in determining Wells Fargo's extraction efforts were reasonable.[147]

Black Iron acknowledges that the reasonableness of the time period and extraction efforts is a question of fact.[148] Questions of fact are reviewed for clear error.[149] The bankruptcy court looked to the record and found that Black Iron did not present evidence of Wells Fargo's unreasonableness.[150] Rather, the evidence showed the parties cooperated over the summer of 2015.[151] Black Iron did not communicate any impatience with Wells Fargo during that time.[152] When Black Iron withdrew its consent for Wells Fargo to be on the Property on August 20, 2015, it was not because of a lapse of reasonable time, but instead was because of the fraudulent transfer lawsuit.[153] The bankruptcy court mentioned Black Iron's reason for withdrawing consent to contrast it with the analysis under trespass law of whether Wells Fargo acted in a reasonable manner and with reasonable promptness. Permission was withdrawn not because of Wells Fargo's delay, but in retaliation for the lawsuit. This point goes to the heart of whether Wells

---

[146] *Id.* at 27–30.

[147] *Id.* at 28–30.

[148] Hr'g Tr., Feb. 5, 2021, at 31 (Mr. Jordan: "[W]hen we're talking about the reasonableness of someone's conduct in removing cars, we are talking about the most fundamental kind of factual issue.").

[149] "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002) (citation omitted).

[150] Ct. Op., 81–84.

[151] *Id.*

[152] *Id.* at 82 (The bankruptcy court found: "Black Iron asserts that Wells Fargo Rail moved slowly and unduly delayed. However, any hints of impatience are missing from the contemporaneous emails themselves.").

[153] Ex. Tr. Recorded Conversation between Steve Gilbert and Andrew Sutherland on Aug. 21, 2015, App. 6366 (Mr. Gilbert: "[A]ll of a sudden now I'm going to end up being sued and it's like okay, we're going to buy three, four, five months then sneak the cars out and stick a lawsuit. See, I haven't been served yet, but I had attorneys telling me, 'Hey, there's a lawsuit.' I've got a copy of it. So I know they're going to serve me. That's – I get that. But they're not – but they're going to pay me my storage then they can take their damn cars. And I haven't even figured the storage out because I just got this at 4 o'clock last night or so.").

Fargo knew or had reason to know the time of the termination or suspension of permission a reasonable period in advance. It did not.

The bankruptcy court found no evidence to support Black Iron's argument that the start date for the extraction efforts was unreasonable.[154] Black Iron did not communicate that a deadline was approaching.[155] The bankruptcy court analyzed the timeline and found that within six weeks of the May 8, 2015, notice from Black Iron, Wells Fargo had hired a repair vendor.[156] The repair vendor needed eight weeks before it could travel to Utah to begin repairs.[157] The bankruptcy court found this schedule appeared to be based on the repair vendor's schedule, rather than on Wells Fargo's.[158] There was no evidence that Black Iron expressed any frustration with this schedule.[159]

In conclusion, Wells Fargo is not liable for trespass. Wells Fargo was entitled to the immediate possession of its Equipment and was privileged against Black Iron to be on the land for a reasonable time to remove the Equipment. Wells Fargo was undertaking reasonable efforts to remove its Equipment when Black Iron suddenly revoked permission to be on the Property. Black Iron's withdrawal was not based on a set deadline or undue delay, but rather was in retaliation for the fraudulent transfer action.

---

[154] Ct. Op., App. 82.

[155] *Id.*

[156] *Id.*

[157] *Id.* at 81–82.

[158] *Id.* at 83.

[159] *Id.* at 82. Black Iron argues that Wells Fargo's extraction efforts were not reasonable because Wells Fargo required the Equipment to be returned in like-new condition. Appellant Black Iron's Br., ECF No. 49, 28–30. It is not clear this argument was raised below and thus it is waived. Black Iron referenced the inspection and the requirement that the cars be in like-new condition in a reply to a motion for summary judgment before the bankruptcy court. Black Iron's Reply in Supp. of Mot. Summ. J., App. 3543. This reference alone does not preserve the argument for appeal.

III. Conversion Order

A. Conversion

Black Iron argues the bankruptcy court erred in granting summary judgment on Wells Fargo's conversion claim.[160] "'A conversion is an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession.'" *Lawrence v. Intermountain, Inc.*, 243 P.3d 508, 514 (Utah Ct. App. 2010) (citations omitted).

First, Black Iron argues a reasonable fact finder could conclude Black Iron was justified in its interference with the Equipment.[161] Second, it argues the court misapplied the law regarding Wells Fargo's alleged deprivation of use.[162] Black Iron states the court treated the lack of lawful justification element as an affirmative defense, rather than as an element of the conversion claim.[163] This improperly shifted the burden of proof to Black Iron to prove lawful justification, Black Iron argues.[164] However, upon review of the bankruptcy court's opinion, this Court finds the bankruptcy court properly analyzed justification as an element of conversion, in which it addressed Black Iron's arguments regarding the justification element.

i.) Interference with Chattel

In the conversion context, interference is not limited to cases in which one party physically moves or takes chattel away from another party, but also includes situations in which one party prevents access to another party's chattel. *See Bennett v. Huish*, 155

---

[160] Appellant Black Iron's Br., ECF No. 49, 30–35.

[161] *Id.* at 30–33.

[162] *Id.* at 33–35.

[163] *Id.* at 30–31.

[164] *Id.*

24

P.3d 917, 928 (Utah Ct. App. 2007); *Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1288 (D. Utah 2009). Here, Black Iron prevented Wells Fargo's access to the Equipment when it sent the August 20, 2015, cease-and-desist email. Wells Fargo had hired a repair vendor that was set to arrive on the Property and start making necessary repairs to the Equipment on the week of August 24, 2015. The August 20, 2015, cease-and-desist email prevented this from occurring.

### ii.) Without Lawful Justification

In considering whether Black Iron was justified in its interference, the bankruptcy court considered whether Wells Fargo delayed in retrieving the Equipment.[165] Black Iron argues the bankruptcy court ignored disputed issues of fact that would justify interference.[166] The disputed facts turn on Black Iron's claims to storage fees under the warehouse lien and trespass theories addressed above.[167] The Court will not revisit these arguments here. Black Iron also argues it was an involuntary bailee.[168] However, Black Iron waived this argument by not arguing it in the bankruptcy court below.[169]

### iii.) Deprivation of Use

Black Iron argues the bankruptcy court failed to find a causal connection between the first and third elements of conversion – the willful interference and deprivation of use.[170] Upon

---

[165] Ct. Op., App. 98–106.

[166] Appellant Black Iron's Br., ECF No. 49, 30.

[167] *Id.* at 30–31.

[168] *Id.* at 32.

[169] Although Black Iron cited to case law regarding warehouse liens and bailors, they did not expressly argue they were an involuntary bailee before the bankruptcy court. Black Iron's involuntary bailment argument, although waived, presents an interesting question – which entity was the hypothetical bailor? CML had a duty to return the cars under the leases and defaulted, leaving the Equipment on the Property.

[170] Appellant Black Iron's Br., ECF No. 49, 33–35.

review, the bankruptcy court found a causal connection between the first and third elements, stating that the August 20 email ended Wells Fargo's permission to enter the Property, which "had the effect of depriving Wells Fargo Rail of the use and possession of the Equipment."[171] Had Wells Fargo entered the land despite the cease-and-desist email, it would have been trespassing. The cease-and-desist email had the effect of depriving Wells Fargo's use of the Equipment.

On appeal, Black Iron argues Wells Fargo cannot both succeed on its conversion claim and defeat Black Iron's trespass claim.[172] It states that if Wells Fargo's assertions that it could not use the Equipment under the trespass claim are true, then Black Iron's interference cannot have prevented it from using its Equipment.[173] However, under the trespass claim, the inquiry was whether Wells Fargo acted reasonably to remove the Equipment, which was relevant to whether Wells Fargo improperly delayed in retrieving its Equipment. Under conversion, the inquiry is whether Black Iron deprived Wells Fargo of the use and possession of the Equipment. By sending the cease-and-desist email, Black Iron prevented Wells Fargo from accessing its Equipment and taking the necessary steps to remove it from the Property.

Black Iron also argues the bankruptcy court ignored a factual dispute over the proximate cause of Wells Fargo's loss of use of the Equipment.[174] But proximate cause is not an element of conversion. *See* Dan B. Dobbs et al., *The Law of Torts* § 4 ("Neither proximate causation nor benefit to a party converting property is an element of conversion.").

---

[171] Ct. Op., App. 107.

[172] Hr'g Tr., Feb. 5, 2021, at 88.

[173] *Id.* at 87–89.

[174] Appellant Black Iron's Br., ECF No. 49, 34.

In conclusion, Black Iron is liable for the conversion of Wells Fargo's Equipment because it interfered with Wells Fargo's possession of the Equipment by sending the cease-and-desist email, it did not have lawful justification, the email had the effect of depriving Wells Fargo of the Equipment's use, and Wells Fargo was entitled to immediate possession of the Equipment from the leases. The bankruptcy court did not err in its analysis.

B. Conversion Date:

Black Iron argues the bankruptcy court did not rule on the conversion date on summary judgment and improperly precluded it from presenting evidence of an alternative conversion date at trial.[175] If the conversion date was later, then the damages calculation would be different. Upon review, the bankruptcy court determined the conversion date in its summary judgment ruling. The court stated:

> When Black Iron sent the original 'cease and desist' email on Aug. 20, 2015, it ended Wells Fargo Rail's permission to enter the Property and access the Equipment. This had the effect of depriving Wells Fargo Rail of the use and possession of the Equipment.[176]

The bankruptcy court ruled on conversion at summary judgment. There was no reason to allow Black Iron to present more evidence about the conversion date at trial.

C. Conversion Damages:

Black Iron argues the bankruptcy court erred in its conversion damages calculation.[177] "[T]he measure of damages for conversion when property is not returned is the value of the property at the time of the conversion, plus interest." *Henderson v. For-Shor Co.*, 757 P.2d 465, 468 (Utah Ct. App. 1988). "This measure is appropriate because the remedy for conversion is

---

[175] *Id.* at 36–37.

[176] Ct. Op., App. 106–07.

[177] Appellant Black Iron's Br., ECF No. 49, 37–39.

analogous to a forced sale of the converted property from the plaintiff to the defendant." *Mahana v. Onyx Acceptance Corp.*, 96 P.3d 893, 899 (Utah 2004). "Market value is defined as the price for which the property is bought and sold at retail in the marketplace or, in the case of unique property, the value to the owner." *Henderson.*, 757 P.2d at 468 (citation omitted). "The primary objective in rendering an award of damages for conversion is to award the injured party full compensation for actual losses." *Id.* (citation omitted).

After finding Black Iron liable for conversion, the bankruptcy court determined damages in the amount of $7,885,584 at trial.[178] The bankruptcy court's decision on damages is reviewed for clear error. *In re Young*, 91 F.3d 1367, 1370 (10th Cir. 1996). Black Iron argues the bankruptcy court awarded Wells Fargo a windfall.[179] Rehashing arguments made above, Black Iron disputes the conversion date and argues because Wells Fargo could not remove the Equipment on August 20, 2015, the cease-and-desist email was not the actual and proximate cause of the harm.[180] These arguments are addressed above and are without merit.

Black Iron also argues the valuation by Wells Fargo's expert included expenses for removal, but because the Equipment was eventually sold as-is, where-is in 2018, these expenses should not have been included in the damages calculation.[181] Finally, Black Iron argues the market for the Equipment had dropped and Wells Fargo suffered no harm because it could not have leased the Equipment.[182]

---

[178] Ct. Op., App. 47–48.

[179] Appellant Black Iron's Br., ECF No. 49, 37–38.

[180] *Id.* at 37–39.

[181] *Id.* at 38.

[182] *Id.* at 39.

This Court finds the bankruptcy court did not err in its damages calculation. The bankruptcy court did not include the cost of removal in its damages analysis. The bankruptcy court found the testimony of Pat Mazzanti credible, and used his testimony as a basis to calculate damages:

> As of August 2015, Mr. Mazzanti valued each railcar at $20,000 per car, for a total of $10,800,000 for the 540 railcars. The 2015 value of the four locomotives was $175,000 each, which works out to $700,000. The total value of the Railroad Equipment in August 2015 was thus $11,500,000.
>
> On or about July 16, 2018, Wells FargoRC sold the Railroad Equipment to AMG Resources. The purchase price was $62,500 for each of the 4 locomotives and $6,230.40 for each of the 540 cars, for a total price of $3,614,416.
>
> Accordingly, the conversion damages will be reduced by the $3,614,416 that Wells FargoRC received for the Railroad Equipment in 2018. The Court determines that the conversion damages are $11,500,000 less $3,614,416 for a total of $7,885,584. Wells FargoRC did not request prejudgment interest on the conversion damages, and hence, none is awarded.

The bankruptcy court did not include the costs of removal in its damages calculation. Rather, it used the testimony of Mr. Mazzanti to calculate the damages itself. Mr. Mazzanti noted the oversupply and took it into account in his valuation of the cars.[183] In conclusion, the bankruptcy court did not err in its damages calculation.

---

[183] Ct. Op., App. 47, "[Mr. Mazzanti] stated that this specific type of open-top hopper was in oversupply in 2015 and had been for about eight or ten years. These types of railcars had been commonly used to haul coal, but with coal demand decreasing, there was less demand for these types of railcars, causing an oversupply and a substantial decrease in the value of the railcars. Mr. Mazzanti took those issues into account when determining the value of the Railroad Equipment."

IV. Fraudulent Transfer

Black Iron argues the bankruptcy court erred in finding the Transfer[184] from CML to

GDC and Black Iron was fraudulent.[185] The bankruptcy court found the Transfer was fraudulent

under both Utah Code § 25-6-5(1)(a) and § 25-6-6(2).[186]

A. Utah Code § 25-6-5(1)(a):

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor, whether the creditor's claim arose before or after the transfer was made
> or the obligation was incurred, if the debtor made the transfer or incurred the
> obligation:
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor.

The bankruptcy court determined Wells Fargo's claim arose before the Transfer, a finding

disputed by neither party.[187] However, Black Iron argues the bankruptcy court applied the wrong

legal standard in evaluating whether CML made the Transfer with the actual intent to hinder,

delay, or defraud Wells Fargo.[188] It argues actual intent requires a deliberate act made with actual

intent to harm a creditor through hindrance or delay, whereas the bankruptcy court only looked

to see if there was an intent to put off payment to satisfy the statute.[189] Black Iron argues the

Court must find more than an intention to put off payment to satisfy the statute and also states the

focus should be on the intent regarding the Transfer and not on what happened before or after the

Transfer.[190] "A bankruptcy court's findings concerning intent are factual and subject to review

under a clearly erroneous standard." *In re Seay*, 215 B.R. 780, 788 (B.A.P. 10th Cir. 1997).

---

[184] *See supra* p. 5 for definition of Transfer.

[185] Appellant Black Iron's Br., ECF No. 49, 39–49.

[186] Ct. Op., App. 17–40.

[187] *Id.* at 18.

[188] Appellant Black Iron's Br., ECF No. 49, 39–44.

[189] *Id.* at 40–41.

[190] *Id.* at 40–43. Black Iron likely waived this argument by not arguing it below; nonetheless, the Court will address
it.

This Court agrees with the bankruptcy court that CML had actual intent to hinder or delay Wells Fargo from collecting on its debts. Courts have found the requisite intent is to delay or put off the transfer, not that the transfer itself must be fraudulent. *In re Butler*, 377 B.R. 895, 915 (Bankr. D. Utah 2006) ("Case law treats 'intent to hinder or delay' as an intent to improperly make it more difficult for creditors to reasonably collect on their debts.").

First, the bankruptcy court found the forbearance negotiations were a way to put off payment to Wells Fargo.[191] Citing to emails in evidence that instructed CML representatives to "drag your heels" and to "push [Wells Fargo] out," the bankruptcy court found an intention to delay payment to Wells Fargo "whether that payment was to be made pursuant to a forbearance agreement or the Leases."[192] The bankruptcy court then cited to phone calls between Conboy and Steve in which they discussed payment to other creditors with the money from the Transfer, but excluded Wells Fargo's obligation from payment.[193] This intent came to fruition when other

---

[191] Ct. Op., App. 22.

[192] *Id.*

[193] Ex. Tr. Recorded Conversation between Steve Gilbert and Michael Conboy, Mar. 25, 2015, App. 4078: (Mr. Gilbert: "—that's under dispute in the lawsuit, correct?" Mr. Conboy: "No, no, no, no. We [CML Metals] would owe them [WFRC] that money. That's – that's – those are leases that we haven't – we still have lease payments going on in the future, so those are lease payments. We're – we're – we're going to dispute it and say, well, you promised us other cars and maybe we win, maybe we don't, but we will owe them." Mr. Gilbert: "That's going to be down the road?" Mr. Conboy: "It'll be down the road, but I've got to have the plan to have the cash to pay them." Mr. Gilbert: "Well, but if you – if they didn't give you the right cars and they didn't perform, then there's some, certainly, negotiating in good faith." Mr. Conboy: "There is but, you know, there's nothing contractually – there was no contract – nothing in the contract that said they were providing us those cars. Those were the conversations Dale had. So my view is we're going to owe them the money.").

This Court also finds persuasive another excerpt from a phone conversation between Mr. Conboy and Mr. Gilbert on March 25, 2015, App. 4080 (Mr. Conboy: Well, how do I clear – how do I clear my debts then? Mr. Gilbert: "Well, your debts rights now are $3.4 million, that's real." Mr. Conboy: "They're – they're $4.6 - $4.6 plus [Wells Fargo] of $1.4." Mr. Gilbert: "Well, you can't throw in [Wells Fargo], then, because they're going to stay with CML and they can – they can fight CML all they want; who gives a shit.").

*See also* transcript of conversation between Mr. Gilbert and Mr. Getz on April 1, 2015, App. 6250: (Mr. Getz: "[N]o one's going to get screwed there. Just [Wells Fargo' is going to lose the form helm. That – that will be outstanding with Metals, but that won't affect you.").

creditors were paid out of money from the Closing by CML, but Wells Fargo was not.[194] The

bankruptcy court then found, "This result, combined with the evidence of intent to hinder or

delay payment to a creditor, persuades the Court to conclude that CML Metals' intent during the

forbearance negotiations, while negotiating the Transfer, and when making the Transfer itself,

was to hinder and delay payments to WFRC on its claim."[195] This Court agrees.

    Additionally, Black Iron argues in its reply brief that the bankruptcy court applied the

preponderance of the evidence burden of proof, but that a 2020 Utah Supreme Court case

clarified the standard of proof is clear and convincing evidence.[196] Black Iron argues: "As

explained in *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879 (Utah 2020), a plaintiff

must prove by clear and convincing evidence that the transfer was made 'with actual intent to

hinder, delay, or defraud.'"[197] 469 P.3d at 890. Black Iron has not explained why this Court must

apply 2020 case law retroactively to a 2019 decision.[198] However, even applying the clear and

convincing standard, there was sufficient evidence to find the requisite intent because CML's

own actions and communications demonstrate its intent.[199]

    This Court agrees with the bankruptcy court's finding that the Transfer was fraudulent

under Utah Code § 25-6-5(1)(a). This Court could uphold the fraudulent transfer decision on this

---

[194] Ct. Op., App. 16: "At the Closing, the title company was instructed to disburse payments to various creditors, including $1.7 million to Union Pacific, $1.7 million to SA Recycling, and smaller amounts to various vendors and creditors. No amounts were paid to WFRC at the Closing.".

[195] *Id.* at 24.

[196] Appellant Black Iron's Reply Br., ECF No. 63, 17.

[197] *Id.*

[198] *Id.*

[199] "Evidence is clear 'if it is certain, unambiguous, and plain to the understanding,' and it is convincing 'if it is reasonable and persuasive enough to cause the trier of facts to believe it.'" *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1194 (10th Cir. 2002) (citation omitted). "Clear and convincing evidence is "not a quantum of proof, but rather a quality of proof." *Id.*

ground alone. Because the bankruptcy court also found the transfer was fraudulent under Utah Code § 25-6-6(2), this Court will now address the arguments on appeal.

B. Utah Code Annotated § 25-6-6(2):

> "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent." Utah Code § 25-6-6(2).

Here, Black Iron argues the bankruptcy court erred by finding Black Iron and GDC were statutory insiders of CML, by finding GDC was an affiliate of CML, and by finding that the Transfer was for an antecedent debt.[200] Additionally, GDC argues the bankruptcy court erred by finding the Transfer was for its benefit.[201]

i.) Insiders

"A bankruptcy court's determinations of insider status ... [is] reviewed on appeal under a 'clearly erroneous' standard." *In re Adam Aircraft Indus., Inc.*, 510 B.R. 342, 348 (B.A.P. 10th Cir. 2015). First, the bankruptcy court found Steve was an insider[202] of CML because "he was the father of CML Metal's president, Dale, at the time of the Transfer."[203] Additionally, Dale was "a shareholder in GDC at the time of the Transfer."[204] Black Iron does not dispute Steve's status as an insider.

---

[200] Appellant Black Iron's Br., ECF No. 49, 44–49.

[201] Appellant GDC's Br., ECF No. 48, 4–13.

[202] The statute defines insider: "'Insider' includes: (b) if the debtor is a corporation: (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner in a partnership described in Subsection (7)(b)(iv); (vi) a limited liability company of which the debtor is a member or manager; or (vii) a relative of a general partner, director, officer, or person in control of the debtor." Utah Code § 25- 6-2(7).

[203] Ct. Op., App. 20.

[204] *Id.*

Statutory insiders also include affiliates,[205] "or an insider of an affiliate as if the affiliate were the debtor." Utah Code Ann. § 25-6-2(7)(e). The bankruptcy court found GDC was an affiliate of CML because it operated the Mine for CML. It also found Steve was an affiliate of GDC because "he owns and controls 20% or more of the outstanding voting securities of GDC."[206] It further found Steve was an affiliate of Black Iron because of his ownership and control of Black Iron.[207] The bankruptcy court then found GDC and Black Iron were statutory insiders of CML because of their affiliate status and because of "the control Steve exercised over these entities."[208]

Black Iron finds fault with this analysis and argues the Court should only look to the corporate forms of the entities.[209] This Court declines to limit its analysis of insiders for the same reasons stated by the bankruptcy court – "[t]ransferees should not be able to escape fraudulent transfer liability merely by incorporating and then directing that the assets be transferred to wholly controlled incorporated entities."[210] The bankruptcy court correctly found GDC and Black Iron were insiders of CML. First, GDC was an affiliate and thus an insider of CML

---

[205] "'Affiliate' means: (a) a person who directly or indirectly owns, controls, or holds with power to vote, 20% or more of the outstanding voting securities of the debtor, other than a person who holds the securities: (i) as a fiduciary or agent without sole discretionary power to vote the securities; or (ii) solely to secure a debt, if the person has not exercised the power to vote." Utah Code § 25-6-2(1). Black Iron also disputes that GDC was an affiliate of CML. Specifically, Black Iron argues GDC was not an affiliate because it did not operate every aspect of CML's business.

[206] App 20–21.

[207] App. 21.

[208] App. 21.

[209] Appellant Black Iron's Br., ECF No. 49, 46.

[210] Ct. Op., App. 21, citing as persuasive *Matter of Galaz*, 850 F.3d 800, 803, 805 (5th Cir. 2017); *see also In re Fortune Nat. Res. Corp.*, 350 B.R. 693, 696 (Bankr. E.D. La. 2006); *SE Prop. Holdings, LLC v. Center*, 2017 WL 3403793, at *20 (S.D. Ala. Aug. 8, 2017).

because of its mining contract.[211] Second, Black Iron was an insider of CML because of its ownership by Steve, who was an insider of CML based on his family relationship with Dale.[212]

### ii.) Antecedent debt

Black Iron next argues the Transfer was for more than an antecedent debt, not *only* an antecedent debt, and therefore the Transfer does not satisfy the statute.[213] Black Iron has not supported this argument with applicable case law.[214] Wells Fargo cites to persuasive case law interpreting a similar provision of the bankruptcy code, section 547.[215] "Section 547 does not require that the transfer of the Debtor's property be exclusively for antecedent debt. Rather, Section 547(b) states that a transfer must be made 'for *or on account of* an antecedent debt.'" *In re Adventist Living Centers, Inc.*, 174 B.R. 505, 513 (Bankr. N.D. Ill. 1994).[216] If the drafters intended for the statute to be read as Black Iron suggests, they could have added the words "only" or "exclusively" to the code. They did not.

The bankruptcy court found "a significant antecedent debt was owed by CML Metals to GDC, and that the antecedent debt was satisfied in the Transfer."[217] Additionally, it found the claim for non-payment under the Leases existed before the Transfer and was thus an antecedent

---

[211] *See* Mining Contract, App. 3704–23.

[212] Tr. Dep. Steve Gilbert Mar. 30, 2018, App. 156; 160–61; 168.

[213] Appellant Black Iron's Br., ECF No. 49, 48–49.

[214] *See* Appellant Black Iron's Br., ECF No. 49, 48–49. Black Iron cites to *Beck v. BidRX, LLC*, 918 N.W.2d 96, 101 (Wis. Ct. Appx. 2018) and *Fina Oil & Chem. Co. v. Pester Mktg. Co.*, No. 95-1367-JTM, 1997 WL 225900, at *15 (D. Kan. Apr. 25, 1997). In *Beck*, no evidence supported the transfers were for an antecedent debt. *Beck*, 918 N.W. at 99. And in *Fina*, the court found the transfer was not to insiders. *Fina*, 1997 WL 225900, at *15. While the court states, "the transfer was not exclusively for an antecedent debt," this statement alone does not support the proposition Black Iron argues for. *Id.*

[215] 11 U.S.C. § 547.

[216] *Compare* 11 USC § 547(b), *with* Utah Code Ann. § 26-6-6(2).

[217] Ct. Op., App. 35.

35

debt.[218] "[W]hether the transfers were made in payment of antecedent debts [is a] factual

question[] ... review[ed] for clear error." *In re LGI Energy Sols., Inc.*, 482 B.R. 809, 814 (B.A.P.

8th Cir. 2012), *aff'd as modified and remanded*, 746 F.3d 350 (8th Cir. 2014).

Specifically, the bankruptcy court found:

> CML Metals received $13,784,346.91 for the Mine, in a combination of cash,
> debt forgiveness and assumed liabilities (the "Purchase Price"). GDC gave credit
> for approximately $2,988,746.03 in outstanding amounts which were owed by
> CML Metals for the standby charges, as well as costs for regular ore, lean ore,
> blasting costs, waste costs, tailings costs and royalty costs. GDC also assumed the
> Mike Conboy Note receivable in the amount of $2,902,900.06. The other
> liabilities assumed included GDC accrued invoices, the stockpiled iron ore cost,
> accrued interest on GDC's invoices, accrued property taxes for 2014 and 2015,
> and an asset retirement obligation. Black Iron received a loan from GDC so that it
> could pay CML Metals $4.5 million as the cash portion of the Purchase Price,
> which was allocated to pay off loans to SA Recycling (approximately
> $1,767,305.82) and Union Pacific ($1,746,198.35), and to pay off accounts
> payable ($189,704.14), a capital lease pay off to an unidentified party
> ($11,896.74), and to pay closing costs of $4,220. CML Metals received
> $780,614.95 in cash that was not broken down further on the Purchase Price
> Reconciliation statement, although Mr. Bradley testified that that amount was
> used to pay off creditor Trafigura and the Court finds his testimony credible on
> that point. This combination of cash, loan forgiveness and assumption of
> liabilities was the value provided by the transferee.[219]

The bankruptcy court correctly found CML made the Transfer to GDC for an antecedent debt.

This conclusion had factual support in the record.

iii.) CML transferred the assets to GDC for GDC's benefit

GDC argues it was not a transferee for purposes of the statute because it was not an initial

Transferee and the Transfer was not made for its benefit.[220] Specifically, because GDC did not

receive the Assets, it argues the statute should not apply to it.[221] The bankruptcy court found

---

[218] *Id.* at 35–36.

[219] Ct. Op., App. 26.

[220] Appellant GDC's Br., ECF No. 48, 4–13.

[221] *Id.* at 4.

GDC did not need to actually receive the assets to be a "transferee" under the UFTA.[222] The Court utilized the "dominion or control" test in *Pia Anderson*,[223] and found that unlike the law firm in *Pia Anderson* (which was not a transferee because it did not exercise dominion or control over a client trust fund account), GDC was a transferee because "GDC acted on its own account, and had the authority to direct the assignment and disposition of the Assets, which it used to create Black Iron and then assign its rights in the APA to Black Iron."[224] The bankruptcy court thus found that GDC had "dominion and control" over the assets.[225]

Like the analysis above regarding insiders, to allow an entity to escape liability by creating another business entity and assigning its rights to it would be to eviscerate this section of the fraudulent transfer code. It would invite entities to create new entities and assign their purchase rights to them. In addition to choosing to assign its rights to Black Iron, GDC also settled a nearly $3 million debt with CML.[226] The bankruptcy court noted that the Assets went to "an entity that would continue to use GDC's mining services if and when the Mine becomes operational again."[227]

GDC argues the Transfer was not made for its benefit because "there is no evidence GDC guaranteed any debt, let alone debt that was reduced by a Transfer of CML's assets."[228] GDC takes issue with the bankruptcy court's definition of the term "transfer," and argues it was

---

[222] Ct. Op., App. 35–39.

[223] *Timothy v. Pia, Anderson, Dorius, Reynard & Moss LLC*, 424 P.3d 937, *cert. granted sub nom. Timothy v. Pia Anderson Dorius Reynard Moss*, 421 P.3d 439 (Utah 2018).

[224] Ct. Op., App. 37.

[225] *Id.*

[226] *Id.* at 38.

[227] *Id.*

[228] Appellant GDC's Br., ECF No. 48, 14.

overbroad.[229] However, GDC does not support this contention with controlling case law.[230]

Wells Fargo cites to persuasive case law to argue that GDC's interpretation of the code is overly

narrow.[231]

The bankruptcy court found:

> In the case before this Court, GDC was able to choose its benefit . . . Rather than
> receiving the Assets itself, GDC, just prior to the Closing, chose to direct them
> into a separate entity (Black Iron) which was also owned and controlled by
> Steve.[232]

> In addition, as reflected on the Purchase Price Reconciliation, GDC settled
> $2,988,746.03 that CML Metals owed to GDC as part of the consideration for in
> the Transfer. Further, the Assets went to an entity that would continue to use
> GDC's mining services if and when the Mine becomes operational again.[233]

The court further stated:

> The Court bases its determination that GDC is a transferee within the meaning of
> the UFTA on the fact that GDC was able to control the disposition of the Assets.
> Steve (owner and controlling party of GDC) did, in fact, create a new legal entity,
> decided how to divide the benefits and obligations of the Transfer between GDC
> and Black Iron, and otherwise had full control over the structure of the
> Transfer.[234]

This Court finds no error with the bankruptcy court's analysis under the UFTA here. GDC

benefited from the Transfer by electing to direct the Assets to Black Iron and by settling a nearly

$3 million debt with CML.

---

[229] *Id.* at 14–15.

[230] *See* Id.

[231] Wells Fargo argues: "Courts also routinely reject GDC's narrow interpretation, noting that "nothing in the [statute's] text ... limits 'the entity for whose benefit' the transfer was made *only to a debtor or guarantor.*" *In re Meredith*, 527 F.3d 372, 375 (4th Cir. 2008) (emphasis added); *see In re TOUSA, Inc.*, 680 F.3d 1298, 1313 (11th Cir. 2012) (acknowledging that while a guarantor "relationship may be the paradigmatic case, it is not the only circumstance that can give rise to 'for whose benefit' liability"); *Boyer v. Belavilas*, 474 F.3d 375, 377–78 (7th Cir. 2007) (holding that transfer was made for benefit of non-debtor/non-guarantor who exercised dominion over transferred assets); *In re Brooke Corp.*, 488 B.R. 459, 468 (Bankr. D. Kan. 2013)."

[232] Ct. Op., App. 38.

[233] *Id.*

[234] *Id.* at 39.

CONCLUSION

The bankruptcy court's memorandum decisions and orders are AFFIRMED. Black Iron was not entitled to storage fees under its contract implied-in-fact, contract implied-in-law, or warehouse lien theories. Black Iron's trespass theory fails. Black Iron converted Wells Fargo's property when it sent the cease-and-desist email. The bankruptcy court properly found the date of conversion was August 20, 2015, and did not err in its damages calculations. Finally, Black Iron and GDC are liable for fraudulent transfer under §§ 25-6-5(1)(a) and 25-6-6(2) of the UFTA.

DATED this _16th_ day of September, 2021.

Bruce S. Jenkins
United States Senior District Judge

39